## Garlic's Case.

*Henry S. Drinker, Jr.*, for Board of Censors.
*Michael J. McEnery*, for respondent.

GORDON, JR., J., Jan. 11, 1929.—This case is before us on a rule to show cause, granted under Rule 215 of the Rules of Court, upon the petition of the Committee of Censors of the Law Association, praying for the disciplining of the respondent, Simon Garlic, for alleged misconduct in his office of attorney. After hearing, the Committee found the respondent guilty of embezzlement and unprofessional conduct, in two specific instances, and, from the evidence presented before us thereon, we affirm the findings of the Committee as to one of the two instances, but cannot affirm them as to the other.

Considering, first, the case in which we disaffirm the findings of the Committee, which related to an alleged embezzlement of $25 belonging to a client, Madeline Farrell, from a recovery of moneys in an accident case, it will be sufficient to say that the testimony of a witness before us, who should have been, but was not, called before the Committee by the respondent, raises a sufficient doubt as to the correctness of the client's testimony, that she did not receive the money, to make us hesitate to reach a conclusion adverse to the respondent. We, therefore, acquit him of the misconduct alleged against him in this matter.

With respect to the charge in which we affirm the findings of the Committee, the evidence supporting it is clear and certain, and in its essential and controlling features, is admitted by the respondent. In March, 1926, August W. Schwing retained the respondent to represent him and his minor son in a claim against the Philadelphia & Reading Railway Company for damages for a serious injury to the son involving the loss of both of his feet by being run over by a train. After some negotiation, the respondent represented to the client that the case could be settled for $5000, and, having secured the latter's agreement to such a settlement, induced him to execute a release to be used

for that purpose. The respondent then settled the case with the railroad for the amount agreed upon and, on July 23, 1926, received the money from the company. The proceeds of the settlement were deposited at once by the respondent in his personal account and converted by him to his own use; and thereafter, for a period of two years, he repeatedly reported falsely to his client that settlement had not yet been made, so that the client learned the truth only when a representative of the Committee of Censors, which was conducting a general investigation, disclosed it to him in the summer of 1928.

The respondent admitted that, after receiving the money from the railroad company in settlement of the case, he deposited it in his own account and appropriated it to his own use. He claimed, however, first, that, notwithstanding this was a clear misappropriation of the client's funds, he thought he had a legal right to do so, so long as he was solvent; and, second, that he did inform his client of the receipt of the money, that the client authorized him to invest it for the boy, and that he had invested it in a mortgage. When asked for details of the investment, however, the respondent said that, having at the time a half interest in a mortgage owned by his mother, he used the money and treated his interest in the mortgage as belonging to the boy, although he failed to show any declaration of trust or other instrument in favor of the boy, or even that the interest which he claimed in the mortgage held by his mother rested on anything other than his own unsupported assertion. This mortgage was paid off in the summer of 1927, and the respondent testified that the proceeds were invested in first mortgage coupon bonds of a Chicago apartment-hotel. When asked by the Committee of Censors, at its hearing, to produce the bonds, the respondent, who at that time said they were registered bonds, declared that they were in a safe-deposit box in New York, but, after some delay, produced them. As already noted, they actually were coupon bonds, and had been produced from his mother's private safe-deposit box in this city. At a later stage of the hearing before the Censors, the respondent took his client to a bank, under circumstances which will be commented on hereafter, where he deposited, in the name of himself and his client, as trustees for the boy, the amount due the boy and his father.

Taking it at its best, this explanation by the respondent of his conduct is an admission of a misappropriation of a client's money, and a neglect and betrayal of the client's interests, scarcely less culpable than the deliberate embezzlement of which it is a transparent evasion. In the handling of a client's moneys, an attorney occupies a position of trust and confidence of the highest order, the corollary of which is the duty scrupulously to safeguard and protect it in the form in which it is received and to deliver it intact to the client at the earliest possible moment. Therefore, the mere mingling of a client's moneys by an attorney with his own is a wrongful misappropriation of them, while the actual personal use of them is an embezzlement, regardless of the responsibility of the attorney. A client cannot be compelled to take the solvency of the attorney in lieu of the money in hand. This is so obviously true, and so thoroughly grounded in the very foundations of professional honor and integrity, that we would have deemed it unnecessary even to state it, had not the respondent asserted the contrary as one of his defenses to the rule.

Chief Justice Sharswood, in a volume of lectures on professional ethics, delivered before the Law School of the University of Pennsylvania and published in 1854, thus solemnly cautions the young lawyer respecting his duties in the handling of clients' moneys: "Most emphatically should it be said, let nothing tempt you, not even the knowledge and consent of the client, to keep

the money which may come to your hands professionally one single instant longer than is absolutely necessary. The consequence of any difficulties arising upon this head will be fatal to your professional character and prospects." The literary charm and edifying instruction of this work merit the careful and constant study of the bar, particularly of its younger and more inexperienced members. It is spiritually strengthening, and should be a "lamp unto the feet and a light unto the path" of the advocate seeking safe passage through perplexing questions of professional propriety.

The respondent's second defense, which is based upon the contention that his client authorized him to invest the money for the boy, and that he did so in the manner already indicated, is without merit in fact. It rests upon his own assertion, not only in those particulars in which it is contradicted by the client, but also in those in which, if true, it could and should be corroborated by documentary evidence or the testimony of others, and, in its inherent improbability, completely fails to carry conviction. It is impossible to believe that a client, who has authorized his attorney to invest money for him, and who, for two years or more, has been content with the assurance of the attorney that his directions have been carried out, would, when questioned by the Censors, assert and consistently maintain, not only that he never authorized such use of the money, but also that he did not even know his case had been settled. His dissatisfaction in such circumstances would be directed to the failure of the attorney to pay over money received, rather than to his neglect to settle the case. Again, the total absence of those corroborating documents—such as letters of notification of settlement, confirming the carrying out of alleged instructions, disclosing the details of investments or changes therein, declarations of trust, evidences of ownership, interest payments, &c.— to which a real transaction would give rise, wholly discredit the respondent's answer to the charge.

It is unnecessary to point out the many other particulars in which the respondent's story is faulty. It abounds in absurdities and improbabilities, and, on its face, is a palpable attempt by patent falsehood to deceive the court, of which he is an officer, and to mislead its judgment in its search for the truth of the matter. One other significant circumstance, however, should be mentioned. After his interview with the Censors' investigator, Mr. Schwing testified before that body against the respondent and told how, for years, he had been repeatedly deceived and put off by the respondent's assurances that the settlement was still in progress and had not yet been consummated, and this story he consistently maintained and repeated, both in public and private, even to the hearing before us. After he testified before the Censors, however, he was enticed to the respondent's office where he was skilfully cajoled and tricked into signing a statement repudiating his testimony before the Censors. His want of familiarity with the language probably facilitated the framing of the statement and the procuring of his signature to it, while his caution was lulled by the promise of prompt restitution of the moneys due him.

It requires no subtlety of discernment to appreciate the real nature of this attempt to discredit the testimony of Mr. Schwing, and to create the appearance of corroboration of the respondent's story that he was authorized to invest the money in question for the boy. The circumstances under which the statement was secured, and the evident unreliability of all the witnesses to its execution, except the official stenographer, who, we are satisfied, acted innocently in the matter, clearly disclose its want of evidential value. It is important, however, for the light it throws upon the *bona fides* of the respon-

dent's defense to the charge against him, by indicating the length to which he is prepared to go to deceive both the Censors and the court, to each of which he is under a solemn obligation to behave with fidelity and to use no falsehood. Such practices are destructive of that relation of absolute trust and confidence between the bench and bar, without which neither can render its full measure of public service. The important and honorable office, which the Censors render to the profession, and to the community, compels us to stamp with our condemnation the employment of falsehood and deception in dealing with them. Indeed, such methods in themselves justify the application of the ultimate disciplinary measure of disbarment.

It would serve no practical purpose to elaborate further the details of the respondent's misconduct. We have searched the evidence diligently, but without avail, to discover some mitigating circumstance to justify withholding a remedy which is always reluctantly applied. This respondent has more than once heretofore been reprimanded and warned by the Committee of Censors. He has now betrayed a client's trust, embezzled his money, and, when detected, has resorted to equivocation and deceit to evade the consequences of his wrongdoing. A shamed profession can redeem and preserve its high repute, and rehabilitate itself in the public confidence, only by sternly expelling from its ranks one who has so grievously dishonored its traditions.

The rule of the Committee of Censors is, therefore, made absolute, and the prothonotary is directed to strike from the roll of attorneys of the court the name of Simon Garlic, the respondent, and to give notice of this action to the Orphans' Court of Philadelphia County and to the Supreme and the Superior Courts of Pennsylvania.